MSNBC Good morning. My name is Tom Banducci. I am an attorney in Boise, Idaho, and represent the plaintiff and appellant in this action, 12 AMERICANS. I believe that the briefs have thoroughly discussed the factual background relative to this case. There was a business proposition that was made by my clients to MSNBC for a polling methodology that would be used in connection with the 2000 federal and state election process. And the meetings, correspondence, emails that went back and forth between 12 AMERICANS and MSNBC prior to the submission of a business proposal in October 11, 1999, is well described in the briefing. The proposal that was sent on October 11 was the focus of the district court's decision when it granted the motion for summary judgment as requested by MSNBC. And in particular, the court focused on the first paragraph of that proposal. I don't think it's in dispute that the proposal, which is approximately a two-and-a-half-page, single-space document, covers a variety of issues and, in fact, covers all of the essential elements that would be was the language in this first paragraph that talks about... Our attorneys have not reviewed this proposal. We offered as suggestions and the basis for an agreement to be prepared by MSNBC, which we would then review. That's correct. And that suggests that, hey, we're just in the talking stages here. And then you want to say when somebody says, we've got a deal, that that transmogrifies into a contract. No, not quite. What I want to say is that the language that you just read can be read to mean that the offer that was being made in the proposal, which is clear from the other language in that paragraph, such as you asked for a letter outlining the specifics of a business proposal to build on the conceptual material we discussed in our meeting. Thus, the following proposes a working relationship between MSNBC on the sentence in the paragraph preoccupied the district court... But then it gets to the end of the same letter and it says, we hope this meets your expectation for beginning the development of a business relationship. It doesn't sound like a contract either or an offer. That's correct, Your Honor. And to characterize this proposal as precise would be an error. It's not as precise. It might be quite precise, but it was not intended to be an offer that could be accepted by the — without more, because at the beginning, the 12 Americans specifically reserved the right to review whatever came out of it. And at the end, they characterized it as the beginning of the development of a business relationship rather than an offer that could, without more, be accepted. Well, the latter comment, the beginning of a business relationship, presupposes a relationship. These relationships change. They might develop into other aspects of a relationship. The scope of the services might change. To say that this is the beginning of a relationship could be interpreted to say this is the beginning of a contractual relationship. I don't think that that language is particularly problematic. What I would like to do, though, is I would like to address that one sentence that seems to be where the district court stopped its analysis. And before I do, I think that that's an important point to take into consideration here. The court looked simply at this first paragraph in granted summary judgment, which we believe... I never even looked at the rest of it? The court said that the proposal was not an offer and could not be accepted. And so it did not look at the conduct of the parties to determine whether or not there was assent. And this is where the, actually, the Supreme Court in Nimmer is instructed. The court there that offer and acceptance are tools for determining what is mutual assent. The court said that generally speaking, you look to an offer and acceptance to determine whether there is mutual assent. The converse, of course, is that at times that may not be the case. So what we had here was we had an imprecise granted offer. There is language in this paragraph that could be taken to... I read it as an offer inviting an offer. Well, if it was an offer inviting an offer, then wouldn't the court have to look to the conduct of the parties subsequently? And what happened subsequently? What happened subsequently was that there was performance. Not only was there performance, but there was acceptance of the terms of the proposal. What performance were you expecting? What performance was 12 Americans expecting, and what was, what happened? The... What are the undisputed facts show that happened? The undisputed facts show that in order for this polling methodology to perform, there was going to be a need to create a website that would be visited... Was that performance before or after the December phone call that said we've got a deal? This was after the we've got a deal call. Okay. But what about before we've got a deal? As far as performance? Yes. There was effectively no performance before the phone call of we've got a deal. And what would there be to indicate what did happen during that two-month period? I mean, one additional thing that worries me is that this is an October 11, 1999 letter. The we've got a deal presumably was an indication that we want to go ahead and set up an agreement with you on some terms, but who's to say it's these terms? Those, this letter was the only proposal before MSNBC. What had happened was... I'm asking, what happened in the interim? Were there discussions in the interim? What happened in the interim, there was a meeting in September and these concepts were discussed. Subsequently, the proposal was submitted in October. There was no response for quite a while. The briefs do outline the internal back and forth going on at MSNBC, culminating in an email from the editor-in-chief to the gentleman who had the we've got a deal telephone call, telling him, talk to your boss, make a decision, and then go tell 12 Americans what you've decided. The next day, Mr. Wright, Dean Wright, who was the political editor, called Mr. Maxwell and said, we've got a deal. Now, the only thing that had been, excuse me, the only document... As it turned out, eventually... Pardon me? As it turned out, eventually, MSNBC did produce a proposal which was different from this one, right? Six months into the performance of the project, yes. And what's interesting about that document, it is characterized as a counteroffer. And yet, if one looks at that, and that is at 53 of the record excerpts, most of what is being, quote, counteroffered here has already been done. In other words, although 12, excuse me, MSNBC would characterize this document as the end of the negotiation and the result of discussion. In fact, what happened before this letter came out was that 12 Americans had performed its work, and then what they got in June was something that effectively memorialized what they had done. Because if you look at that document, it talks about how the websites between 12 Americans and MSNBC would be linked. That was already done. The website by 12 Americans had already been developed, and $200,000 of 12 Americans' money had been invested in that already. So this was not a counteroffer so much as it was a new deal that they were trying to push upon 12 Americans after they had effectively performed. I want to go back to this paragraph, because I have obviously read the Nimmer case very closely. I've also read the Keystone v. Xerox case, which I realize Justice Trott was on that panel. And really, the question before this Court is, is this a case where Nimmer should apply and where Keystone should apply? And I think that there are two very important distinctions. Are you going to talk about the statutory frauds problems? Pardon me? Are you going to talk about the statutory frauds problems? Yes, I am. As soon as I finish this next comment, Nimmer and Keystone both refer specifically to an unequivocal future binding document. And Nimmer This one does too. No, all this says is that a document would be sent back to them for review. If you look at that sentence, which seems to be controlling the destiny of this case, it says, we offer it as suggestions. Now, the Court got hung up on the word suggestions. What are suggestions? Suggestions are terms. There certainly were suggested terms in this proposal. It doesn't mean that those suggested terms cannot be accepted. And the basis for an agreement to be prepared by MSNBC, which we would then review. That's correct. So therefore, there is going to be a document, which we are then going to review. Yes. Yes, there is going to be a document. There is going to be a document. But as the Court I'm sorry, but you began by saying that this is different from the other cases, because there they specifically contemplated a later document. It is. This specifically does contemplate a later document. Well, a document, yes. But the question is, when does the contract form? And under Washington law, and this is cited in the Keystone case, this Court stated, it is possible for parties to enter a binding contract even if the parties contemplate a more formal future document. In such a case, the parties asserting the existence of the contract must prove that the terms of the contract are stated, agreed upon, and that the parties intended the terms to be a binding agreement before the signing of the formal document. So that's really the issue here. The question is, does this one sentence regarding suggestions turn it into a negotiation? I think we should discuss the statute of frauds problem. Pardon me? I think we should discuss the statute of frauds problem. All right. I think at the outset it should be pointed out that although that part of the memorandum decision is a bit muddled, the district court only granted summary judgment based on the statute of frauds as to the promissory estoppel clause. That doesn't matter. We could grant it anyway. All right. And the analysis that the court went through in its memorandum decision relates to the promissory estoppel claim. The reason I believe that that is so is because and the reason the court did not attempt to apply statute of frauds to the contract is because the record contains references to promises made by MSNBC to 12 Americans to memorialize the proposal letter in a formal document. And I would refer the court to the supplemental excerpts of record starting at page 45, excuse me, 55, where counsel for MSNBC asked, did anyone at MSNBC promise you that you would have an agreement consistent with the October 11, 1999 proposal? Answer, yes, I think Charlie Tillinghast did. Question, okay, when did he do that? I believe in our initial conversations in January. And it goes on to discuss that. So here there was a promise that we contend was breached and that there are facts in the record to support that. The other basis upon which the court could not have granted summary judgment on the statute of frauds on the contract claim relates to partial performance. But if you read the agreement as an agreement to produce a draft agreement, which is, this is the clinking exception, that's what you're talking about, right? On the statute of frauds. The reason you're saying that you couldn't apply the statute of frauds to the contract claim is because of an exception for where there's a promise to produce an agreement, right? So there was a promise. But if we read it as a promise to produce an agreement, they did produce an agreement eventually in June. But that's not the agreement that we are attempting to enforce. Well, that may be. But it's the agreement that you would have to be attempting to enforce if you were trying to get around the statute of frauds. We believe that the statute of frauds is not applicable because there was a promise to reduce the October 11, 1999 proposal into writing. That was not done. When we filed the lawsuit to enforce the terms that they accepted in the October 11, 1999 proposal. So you think that it's that draft. They had to produce that proposal to write rather than simply to produce a writing. Correct. That was the document that was the only document that existed between MSNBC and 12 Americans at the time that the we've got a deal telephone conversation occurred. You suggest in your reply brief, I believe that we've got to look at the totality of the evidence to see whether the conduct of the parties reflect the existence of a contract. That's correct, Your Honor. Then I have this question for you. I set you up. No, not really. I felt that way. In the red brief, the red brief says and talking about the purported acceptance of the party and the conduct four to five weeks later throughout January of 2012, Americans worked on finding an attorney who could, quote, negotiate the contract. Here's a quote. We have talked to our attorneys about helping us to negotiate our agreement with MSNBC. However, they have both bowed out as they don't feel qualified. Thus, we thought instead of us finding someone else, possibly you or someone at MSNBC could suggest an attorney or two who have worked with opposite MSNBC counsel in negotiating content relationships. And this is cited for the proposition that, hey, you're still looking for somebody to the contract, negotiate the agreement. We'll suggest there wasn't one yet. And I'm aware of that email, Your Honor. The fact of the matter is, however, what we're talking about now are facts. I could show you several other facts and discussions and admissions by MSNBC, for example, where Mr. Tillinghast admits that, quote, it had been our intent all along to use them. There are a number of disputed facts here with respect to whether or not. Well, do you dispute that your side said helping us negotiate our agreement? Your Honor, this takes us back to the infamous sentence in the paragraph. And I would like to address that for a moment. If you look at that sentence, what that sentence says is we're anticipating or acknowledging the possibility of a counteroffer. This is, we're offering this as suggestions and the basis for an agreement with MSNBC that you'll, if you draft it up, we will review it. Twelve Americans knew that MSNBC wasn't going to take this document and sign it. And yet, this document contains all of the essential terms of a contract. Certainly, there is no question about whether there's an arbitration clause that's mentioned in here, an integration clause, a choice of form clause. There are a lot of things that a good corporate lawyer from MSNBC would want to put in that document. And they would want to review that before signing that. The question really before this court that the judge ignored is whether or not, A, this document prohibits acceptance orally. And it does not, unlike NMR and unlike Keystone. B, the next question is whether or not this document has enough of the essentials of a And certainly it does, because it has term. It has compensation. It has property right discussion. It talks about privacy. It talks about the essentials of this sort of relationship. So what are you asking us specifically to do? What I am asking that you do is to reverse and remand this summary judgment decision. And the reason is because this is not a NMR case and because it is not a Keystone case. Absolutely. There are, yes. There are, no, there are, I'm sorry. I spoke over you, Your Honor. Well, you got two questions at once. Do you think there are disputed facts that require a trial on whether this was an offer and acceptance at a contract? Yes. You don't think you're entitled to judgment as a matter of law at a contract? No. No. As I said, the documentation of this is not exactly precise. In terms of a people's intent, whether they have meanings of the mind, I'm looking at a January 31st e-mail from Bob Maxwell to Tillinghast. I thought it might be helpful to summarize what we discussed on Friday. Letter of intent, which doesn't even say contract at this point. You indicated that you should be able to put this together in about two weeks. You felt that such a letter was contingent on getting an okay from your programming people on the doability of the project. That certainly doesn't sound like somebody who thinks he has an agreement that they're going to do this. This was at the end of January. Your Honor, if the Court would prefer, I can go back into the detail of this issue. Mr. Tillinghast was placed in front of 12 Americans after Mr. Wright had his conversation with Mr. Maxwell. Mr. Tillinghast knew nothing about the technology, the methodology, the idea, the proposal. During January, a great deal of time was spent bringing this man up to speed. In the context of the real business world, when you get somebody new in front of you who is now responsible for the business relationship, you don't beat them over the head and say, give us our document. They already had the agreement, the acceptance of their proposal by the guy who was in charge at the time. Who authored the October 15, 1999 email that refers to this letter as a starting point for discussion? I believe it would be Mr. Maxwell. And again, you have a meeting with your potential business partner. You send a proposal out. You don't say, this is it. Take it or leave it. You say, these are suggestions. Suggestions are not incapable of acceptance. The question here, and that was- So you're saying, we were shocked. They accepted. Correct. They were ecstatic that it was accepted. But the fact was, it was accepted. Yeah, but then you back right into the statute of frauds problem. Well, the statute of frauds problem, I believe, falls into the exception simply because you have a record that is very clear that a promise was made to put the contract in writing. And it was not done. And yet, it is being set up as a defense. Your time has expired. Thank you. May it please the Court. My name is Todd Nunn with Prussian Gates Ellis. I represent MSNBC in this case. I would like to start out by answering some of counsel's specific references to clear those up before the questioning starts so that I don't forget. First of all, I'd like to ask this Court to affirm the summary judgment order by Judge Kunow in this case on both of plaintiff's claims, which were dismissed. The statute of frauds problem, let's start there. Mr. Banducci said that there was a promise made. And he referenced S.E.R. 56. And he said he referenced testimony by Mr. Fiedler saying there was a promise by Charles Tillinghast to memorialize the agreement according to the terms in the October letter. In fact, if you look farther down, and in the part that he referenced, was it line 7 to 10 approximately? If you go down to line 21, the question is about that same conversation. Well, did he discuss what the terms would be? Answer, no. Question, did he say that the terms of the writing he would be getting you would be consistent with your October 11, 1999 proposal? Answer, no. Question, did he say anything other than I will be getting you a writing? And when I say a writing, I mean whether he called it a term sheet or a letter of intent or whatever. I quote, I will be getting you a writing in the next couple of weeks. Answer, well, there were many things said, but in that context, no. There was no promise to memorialize the October 11 agreement. I just wanted to establish that right away. The problem with this on the statute of frauds, although I first thought it was dispositive, but if you actually thought that there was an acceptance of this October 11 document, if you thought there were an acceptance of the October 11 document with a promise to memorialize this document in writing, then that would not be barred by the statute of frauds, right? The separate promise to memorialize the October 11 document. If it was a promise to memorialize this document. If there was such a promise. So we're back, are we in the same place? And doesn't the statute of frauds on the contract claim at least, perhaps not in the promissory stop, we'll wrap back into the question, the underlying question of whether this document was capable of being accepted and whether a contract was formed. In other words, I don't think the statute of frauds gets you out of that question. Well, I'm not sure I agree with that. I think there are two separate bases for affirming this. And the district court. I'm trying to ask you, given this Klinke exception, don't we end up in the same place again under the statute of frauds? But Klinke does not apply. I mean, Klinke, there was a promise of a specific terms of an agreement that would be memorialized and signed. Well, that's what they're claiming here though. So we have to go back to the underlying question was, was there such a thing? There's no, there's absolutely no evidence in the record. Even, again, that testimony in the deposition, which clearly Mr. Fiedler of 12 Americans himself admits there was no promise in that particular conversation to memorialize this agreement. Well, that was in January. But their underlying contract claim here is that this October 11th letter was capable of being accepted as written and was accepted by the, we've got to deal, oral telephone call. Correct. And if that were so, let's assume it were so, then I don't think the statute of frauds would help you. So you have to go back and tell us why it isn't so, why no contract was in fact formed, no oral, by the oral we've got to deal contract. Well, certainly I'd be happy to do that. Again, I think they are separate. But the October 11th, 1999 letter, as has been pointed out by Your Honors, was not an offer that was capable of acceptance. It reserves to 12 Americans the ability to review whatever agreement is prepared by MSNBC and then do with it as they will. Let's reverse the situation. Let's say MSNBC was attempting to enforce this. And we said, hey, we have an agreement consistent with your October letter. We want to enforce it. They say, well, look, we said you prepare an agreement and we'd look at it. We never said we'd agree to it. We never said that we'd agree with every term and there wouldn't be further negotiation. What, if anything, is missing from it that's required in order to make it an offer? The bit, well, as stated in the restatement of Contracts 26, there has to be a manifestation of willingness to enter into a bargain. And it's not an offer if the person making it, if it's apparent that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent. Saying you will prepare an agreement and we will review it says, and then we will have a further manifestation of assent before there will be a binding contract. If we were trying to enforce this, they would simply say. I mean, it's always true. I mean, it's amazing how many of these cases we actually get in this Court about, you know, sort of agreements to agree or agreements of letters and of intent and so on, in which there's always a further writing contemplated. When you go to negotiate the settlement of a lawsuit, right, you come at the end of the day and you write down some stuff and everybody signs, and then you go back and argue for two months about the details of the contract, right? Is that what you do when you do negotiations? You go for mediation or something? Potentially, yes. But there are, in those cases, a clear offer and acceptance. We offer to settle this case in exchange for certain consideration. And then there's the agreement, yes, that we'll pay that consideration. Right. But the terms are still to be discussed, exact terms, the waivers and so on. And things fall apart after that sometimes. That can be true. But this is a different case. This is a case like Nimmer, like Keystone. This is a case, well, it's left like Keystone. What I'm really asking you is how can it be that reserving the right to see a detailed writing is enough to say there's no agreement? Because there's no statement that gives MSNBC the power to form a binding contract by saying we accept. If we were trying to enforce it, they would say, look, we said these were suggestions of the basis of an agreement. We said you would prepare an agreement and come back to us and we would review it. We even said our attorneys haven't even seen this proposal. So here we are now. We're reviewing your proposal, and we don't like it. And we're not going to have an agreement. To have an offer and acceptance, MSNBC had to be able to say we accept, and that's it. There is a binding agreement. Certainly details can be worked out later. But you have to have an offer and acceptance. Otherwise, nobody knows what they're agreeing to when and what the terms are. That's why Nimmer is so careful to say you must be careful about preliminary negotiations being confused with offer and acceptance. Well, if you take out the first paragraph and the last paragraph, why isn't it all there? It says exactly who's going to do what and even talks about compensation. Yeah. The issue is not whether there were a number of important terms for an agreement in the letter. That's not the issue. They're there. They're there. So the question is whether the first and the last paragraphs deprive it of its possibility as a matter of law being an offer capable of acceptance. I guess that's one way of putting it. I mean, you can't – I don't think you can dissect the agreement and say, well, what if there was no first and last paragraph? There was a first and last paragraph, and it says – and the first and last paragraph established that it wasn't an offer. It couldn't have been enforced by MSNBC, and it shouldn't be able to be enforced by 12 Americans. Additionally, there was this follow-up email on October 15th saying we just meant this as a starting point for discussions. There are additional emails, and I can cite you to them specifically if you would look. But both sides have lots of emails and lots of statements. Why doesn't that suggest this is a classic case of disputed facts that require a trial rather than summary judgment? The emails that we are discussing, it's not correct that both sides have lots of emails that dispute each other. There are emails showing objective manifestations of ongoing negotiations of these key terms, the key terms that Mr. Benjussi listed, such as compensation. On January 6th, there's an email between the principals of 12 Americans saying we're going to have a meeting with Tillinghast – Charles Tillinghast, who was the business development manager at MSNBC. It was his job to negotiate agreements. They said he told us what we're going to be talking about is a financial relationship and how we get the technology done. Two of the major terms that Mr. Benjussi listed as being present in this letter, these are major terms still being negotiated after the alleged acceptance. That fact alone has been found in other cases to support a summary judgment finding that there was no meeting of the minds at the time that the oral agreement is alleged. But the point is, just because there were terms in this letter does not mean that a contract was formed. Those terms are still being negotiated months down the line. Did that answer your question, Your Honor? I may have lost it in the middle somewhere. Oh, yeah. I mean, it's an answer to the question. Oh, further answer to your question. I can't tell you what my answer is, but I understand yours. No, I guess my point was, there are these emails showing objective manifestations of negotiation. There are no emails between the parties saying, hey, we have a firm agreement. Hey, this is a done deal. What they point to is objective manifestations. And I can't cite you to the exact page of their brief. But if you look at their brief, they'll say there are these objective manifestations. One, we made some statements to third parties who weren't involved in this agreement. And we said, hey, we're working with MSNBC. And MSNBC didn't object. They raised the we've got a deal oral statement. They raised a couple of other issues, none of which, though, contradict these emails showing ongoing negotiations. So I guess my point is, yes, each side has evidence it points to. But the undisputed evidence, the undisputed objective manifestations show ongoing negotiations after December 17th. And that is if you get past the fact that this letter was not an offer. Now, on the issue of Quinky, again, unless, Your Honor, Judge Berzon, you're saying that we've got a deal, somehow is this promise under Quinky. But if it was one, if there was otherwise a con – in other words, you'd only get into the statute of frauds question if there was otherwise a contract. And the only thing wrong with it is that it was oral rather than written. That's correct. So we have to assume when we get to the statute of limitations question that everything you've just said is wrong and that there was an agreement, an oral agreement, as of the December whatever it was, telephone call. Correct. On the terms of the October 11th letter. Otherwise, we don't even get to the statute of limitations. That's correct. All right. So now let's assume all that. If we assume all that, then what we – then why doesn't the Quinky exception apply? Because Quinky requires a specific promise that a – Implicit or implicit? Implicit. Implicit. Don't ignore implicit. All right. Well, I don't see – well, I guess I would say that the – we have a deal. It's not an implicit promise to memorialize the specific terms and sign it. But that's what the proposal was. The proposal was that you are to memorialize the specific terms. So if they accepted it, that's what they accepted. The proposal specifically said that, right? The October 11th letter said that. That's correct. That's correct. I see your point. It was a contract in which MSNBC had an obligation to prepare a writing. If there was a contract. I see your point. I would say that there was not necessarily an agreement that it would be signed, but I see what you're saying. Unless you have any other questions on the contract formation, I guess I would also argue, though, of course, that Keystone, since it was clearly anticipating a written agreement, as you say, Keystone is dispositive, which says when a written agreement is anticipated, that is dispositive of there being a binding contract in advance of that writing. But that can't be universally right. Because as I was trying to show through the usual way in which lawyers negotiate settlement agreements, for example, or at least it's disturbing. Because if you can't have anything until you have where you write something down, agree to it, but agree there's going to be more, then the business world would be somewhat disorganized. Well, in the context of a settlement agreement, I would agree with you. But in the context of a content agreement. A settlement agreement is a contract. No, I agree. But in a content agreement like this one where there are technology issues and there are editorial issues and there are all these other issues that have to be sorted out, there are three or four or five different people who have to agree. In this particular business world, the writing is going to be what is binding. All I'm saying is that therefore your blanket statement at Keystone says this can never happen. Well, yes, your blanket statements are dangerous, I would say. But I would say Keystone is remarkably similar to this case, as is Nimmer. And I think that they're very informative on this issue. Moving on to the promissory estoppel argument. And I can begin with the statute of frauds. Washington has repeatedly rejected a statute of fraud exception for promissory estoppel. And there was, the Clinke exception does not apply to satisfy the promissory estoppel. Because you would already have to, of course, find a contract, as you said, in order to find Clinke applying. The elements of the promissory estoppel are not met because if there was no offer and acceptance, there was no promise to support promissory estoppel, which is made clear in Nimmer, which said with these letters of intent. But when they said we've got a deal, they were saying something. What were they saying? What did we've got a deal mean, then? Well, we've got a deal meant that they were going to enter into negotiations with them, which, it may be a strange judgment as to whether or not you at least get by. A deal is a deal, as they used to say in law school. A deal is a deal. But this was an offer to make an offer. And so we've got a deal. There may have been other things said in that conversation. That's unsaid. But what we do know is we have a letter saying, hey, put something together. We'll review it. We have another email saying, we just wanted to start discussions. Your better argument on this point is, all right, we have a deal. We have an obligation to produce a writing. And we did produce a writing. Well, thank you, Your Honor. And I was getting there. Indeed, there was a writing produced. And they'd never accepted that writing. In fact, they've made it clear in their briefing underlying. Well, you were through the writing. But they're not trying to enforce that writing. That's correct. They're not. And they made it clear that they would not have accepted that writing in their underlying briefing because there was not a revenue sharing provision in it. So that writing was never going to be accepted. But they didn't accept it. And it was withdrawn. But it was produced. And it was being worked on. There's no question that there were active negotiations taking place. There's no question that there was interest at MSNBC in developing this. The other point I wanted to make along this sort of partial performance argument is that when 12 Americans made this letter proposal, they had no product. They had nothing but an idea. And they are now trying to charge MSNBC with the testing of this idea and the validation of their theories and the validation of their survey methodology and the building of a website, which they have needed to have any kind of company or product in any event. And they're trying to charge that to MSNBC, saying they wouldn't have done anything if they hadn't had an agreement. And it strikes me that they see this relationship as a contractor relationship as opposed to the registration of a content provider, and that we were contracting with them to develop a methodology and build a website, which is not correct. This was supposed to be an agreement with a contract provider who had the ability to provide content. And they didn't have that when they started. So this is a pie-in-the-sky idea. And there was a lot of enthusiasm. And there was a lot of happy talk. And that happy talk took the form of a letter, which was not an offer. And there was this phone call where he said, let's, you know, we've got a deal. Let's talk this through. There were subsequent emails where all of the terms were still being negotiated, as Verzone pointed out. There was an email saying, you know, we're trying to get you this letter of intent, not contract, letter of intent. And this is 12 Americans saying this to MSNBC. And you told us that this letter was contingent on getting an OK from your programming people on the doability of the project. So at that point, even the project, the relationship altogether is in question. There was, again, happy talk. There were discussions. There was interest. But ultimately, no agreement. And an agreement should not be enforced. This Court should affirm the district court's order. Thank you very much. MR. BABBITT. Mr. Babbitt, is there really an opportunity to respond, if you'd care to? MR. BABBITT. Very quickly. MR. BABBITT. Just. MR. BABBITT. I couldn't help but note that there was an awful lot of factual argument being made, which, of course, is, this is not the proper place for factual argument. That is a matter for a jury to decide. Whether or not these. MS. NIEUSMA. That depends if the facts are in dispute. MR. BABBITT. Yes. But the facts are disputed. And the briefs, I could take this Court. MS. NIEUSMA. That would be the most useful thing. MR. BABBITT. Well, I think, let me take as an example this position that is being advanced by MSNBC that there were negotiations, there were undecided terms after the conversation between Maxwell and Wright. The dispute here is what was going on, and what was going on was that MSNBC had run into a technical problem in hosting this methodology on their website. So 12 Americans, in order to move this project forward, took over the responsibility for the website. Now, that is a change in scope, but it begs the question of whether or not there was an agreement beforehand. I'm sure this Court is familiar with construction contracts. Scope changes all the time. One party may have a responsibility pursuant to an agreement to complete a project, and yet, since one party may not be able to do that, the other party may step in and do that. Certainly, MSNBC knew that 12 Americans was taking over this responsibility and investing a substantial sum. So is that a change in the negotiating terms? No. It's actually part of the project. One or the other party had to do that work in order to realize this. MSNBC seemed pretty clear that they didn't think the terms were set, but your argument, I assume, would be that doesn't matter. Well, actually, the internal email, again, is equivocal. There is an awful lot at the time that the performance is occurring that says, let's get 12 Americans all that they need with respect to specifications, technological needs, et cetera, so they can do what is in the proposal and what is in what they claim to be their counterargument.   Well, let's go back and check with the programming people and see whether this is doable. That certainly doesn't suggest that somebody thinks they've committed themselves. That is a January communication, Your Honor, where what was happening was that Mr. Tillinghast was being educated anew by Mr. ---- Well, it's not going to come back and say it wasn't doable. I mean, obviously, that question, whether it was doable, it's impossible to answer, no. The fact of the matter is, Your Honor, it was doable and it was done. In fact, it was done even before June when the counteroffer came in. The question of technological feasibility. That isn't my point. My point is that the issue of technological feasibility was still open in January. Your Honor, I assume that to be the case. Does that mean that the proposal was not accepted? That seems to me to be a legitimate argument, that what they thought internally doesn't matter, that we have objective contracts and if it was accepted, it was accepted. Let me go to one comment that was made by Mr. Nunn, that the paragraph reserves the right to review. Yes. If there was a document coming back, they reserve the right to review it. But does that language prohibit acceptance? The major difference between this case, Nimmer and Keystone, is simply this. In Nimmer and Keystone, the creator of the alleged offer used the language that projected future into the future, for future contractual arrangements, as a defense to the creation of the contract. In other words, Nimmer owned the land, said, here's my letter of intent, but you must, in the future, come up with documentation and signing. Same thing in Keystone. In this case, we are the creator of the proposal. We don't take the position that this document prohibits its acceptance orally, as was done by Wright. Yeah, but I can sure hear you arguing, if the shoe were on the other foot, that the first and the last paragraphs of this document. Well, and I think, I hope I would do a good job, Your Honor. But the fact of the matter is, my father used to say the definition of a good lawyer is somebody who can persuasively argue the wrong side of everything. The question is whether or not it's enforceable. Thank you. Thank you both. The case is well-argued, well-briefed. We take it under submission and we're going to take a, about an eight-minute recess before we hear the last case. Thank you.
judges: Trott, Paez, Berzon